## C. A. ABLES v. THE STATE.

### No. 3579.   Decided June 2, 1915.

**1.—Theft—Sufficiency of the Evidence.**

Where, upon trial of theft, the evidence was sufficient to sustain the conviction, there was no reversible error.   Davidson, Judge, dissenting.

**2.—Same—Absence of Witness—Practice in District Court.**

Upon trial of theft, where a witness was absent, and did not testify, and his testimony was material, the State had a right to probe this matter, to ascertain the whereabouts of this witness, and why he was not present to testify; the witness being a brother-in-law to defendant.   Following Jones v. State, 7 Texas Crim. App., 103, and other cases.

Appeal from the District Court of Hopkins.   Tried below before the Hon. Wm. Pierson.

Appeal from a conviction of theft; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*C. E. Sheppard,* for appellant.

*C. C. McDonald,* Assistant Attorney General, for the State.

PRENDERGAST, PRESIDING JUDGE.—Appellant was convicted of the theft of $740 from J. B. Cutts, alleged to have been committed January 9, 1914, and his punishment assessed at the lowest prescribed by law.

Appellant earnestly insists that the evidence is insufficient to sustain the verdict.   This is the most serious, and practically the only question in the case.   We have carefully read, and several times considered, all of the evidence.

Appellant himself did not testify.   He introduced his sister, Mrs. Alsup, and Mrs. Sneed.   If the jury had believed their testimony they perhaps would have acquitted him.   Evidently they did not believe their testimony.   This, under the law, was exclusively for the jury. The statute expressly says, in effect, they are the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony.   Therefore, we think it unnecessary to here state, even the substance of their testimony.   The question, then, for this court to determine is whether or not the incriminating testimony and the inferences to be drawn therefrom, was, as a question of law, sufficient to sustain the verdict.   In our opinion it was.   The jury heard the witnesses testify, saw them when they did so, saw their manner of testifying, and from all of this were better able to determine the truth than this court can be from merely reading in cold type what the statement of facts shows.

We do not propose to quote at length the testimony.   We will give, however, the substance of the material and salient portions thereof.

J. B. Cutts lived in the southern portion of Hopkins County, and

had lived there for many years. Mr. S. A. Ables, the father of appellant, had lived in the same community only a few years. Appellant was a young man then twenty-three years of age, but had not lived with his father in that community,—was a stranger therein. For a few years before then he had lived in different locations in Oklahoma, though he had visited his father on occasions a year or two before this time. He arrived at his father's on a visit on January 8. On January 9, a widow in the same community died. Cutts and his wife and other neighbors went to the deceased's house on the morning of the 9th. Cutts remained there practically all day, from about 10 o'clock in the morning until about sundown in the evening. Appellant and his father together went to the house of the deceased in the morning, but remained only a short time. They together returned there late in the evening and then remained only a short time.

Mr. Cutts testified that when he went to the house of this deceased lady that morning he had $740 currency in his left hand hip pocket in a draw-string leather pouch; that practically during the whole time he was there he stayed out in the yard, sitting on a wash bench or spring seat, alternating and shifting his position from one to the other all day; that he had carried this money thus in his pocket for several months prior to this; that it was in three different rolls,—twenty $20 bills in one roll; in another $10 bills, and in the other mostly $20 bills, with a few tens among them, and probably some fives. Two hundred dollars of the $20 bills was new money, looked like it had never been used at all. The other bills showed to have been used a good deal. Twenty dollars was the largest denomination of any of this money. The prevailing denomination of the bills of the $240 was $20 bills; that from time to time during the whole day he was there he felt for his money to see whether it was there or not, and at no time while he was there did he miss it; that the last time before leaving that he felt for it was a while before sundown and he had the money at that time; that Mr. Ables (appellant's father) and appellant were out in the yard where he was at this last time that he felt and found that he had the money in his pocket; that there was nobody else out there at that time, except those two persons and himself; that just about sundown he left to go home; his home was west and Mr. Ables' home east from the house of the deceased lady; that there was nobody else out there at the time he left except Mr. Ables and appellant. Mr. Ables testified that when he and appellant left there wasn't anyone outside. "We was the last ones." Mr. Cutts further testified that he got about 250 yards from the deceased lady's house on his way home when as he went to go through a wire fence he felt for his money and discovered that it was gone. He immediately retraced his steps, hunting for the money, over the road he had just gone, thinking then that he might have lost it on the road; he did not find it; he got back to the yard of the deceased lady and hunted for it and could not find it; that there was nothing along the road that he had traveled after he left and started home that would conceal the money if he had dropped it; that it was a plain open road,

plumb clean, traveled a good deal; that there wasn't anything to keep him from finding the pocketbook if he had lost it after he started home; that he was in the road all the time; that no one else went along that road from the time he started home, discovered his loss and went back to the house of the deceased; that when he could not find his money he started after Mr. Ables and appellant and overtook them; that when he got in about 100 yards of them he hailed them and they stopped; that he went up to where they were and asked if they had found his pocketbook where he had been sitting, and described it; that Mr. Ables said he didn't; that he had seen his (Cutts') pocketbook sticking out of his pocket; that Cutts then said to appellant, "I am sure one of you picked it up," and said, "I lost it right there where you was at," and defendant said he did not; that he (Cutts) stood and looked at them about a minute and turned and walked off; that he later inquired of all who were at the house of the deceased at the time and none of them had found his money.

Mr. Joe M. Clower testified that he was cashier of the First State Bank at Klondike, in Delta County, in 1914; Klondike was shown to be twenty-five or thirty miles west of north of Sulphur Springs, and where Mr. Cutts lived was ten or fifteen miles west of south of Sulphur Springs. Mr. Clower further testified that on February 13, 1914, appellant deposited $600 in his bank at Klondike; that it was mostly $20 bills, some tens and possibly some fives, mostly twenties; that at the time appellant made this deposit appellant kept some money, he saw it, but couldn't tell how much it was; that there were several bills in the roll; that the money he deposited had been carried in a roll some time and the bills were crimped, very badly crimped,—some of them looked like they had been crowded down some time; that some of the bills then deposited by appellant were new and some were old; that none of it was of a higher denomination than $20; that Mr. Lilly, one of the customers of the bank, was present at the time and he asked appellant where he was from; that appellant said Caney, Oklahoma; that when asked if he knew a certain banker there he said no; that he and Mr. Lilly asked him where he got the money and he said he had sold out in Oklahoma; that he had sold a pair of mules for $400 of the money.

Mr. Joe Lilly testified substantially the same thing as did Mr. Clower. In addition, that he congratulated appellant at the time for depositing his money and told him it was a good idea; that when he saw that he did not deposit all of his money but put some back in his pocket, he said to him, "Son, I would leave all that money here; I would not carry all that money in my pocket." Appellant seems to have made no reply to this but put the other money back in his pocket, depositing only the $600.

Mr. Charlie Phillips, who married a sister of appellant, testified that he did not know appellant until about January, February and April, 1914; that in April he sold him a mare and colt for $140; that appellant paid him a $20 bill down at the time and, wanting some money

himself, appellant gave him (Phillips) a check on the Klondike bank for $200; that he put this check in the Citizens National Bank for collection; the check was shown to have passed through other banks, finally reaching the Klondike bank, where it was paid and remitted; that when Phillips got returns from the check he gave appellant a check for $80 of the money and appellant deposited that check in the State bank. These transactions seem to have occurred at Sulphur Springs, in Hopkins County. It seems that Cutts soon afterwards heard of this, garnisheed the Klondike bank, at least tied up the balance of the money in that bank, and that appellant was arrested at that time charged with this offense; that he had an examining trial and that Mr. Clower testified at that time, appellant being present and heard his testimony.

Mr. Clower further testified that in the summer of 1914 he saw appellant in Klondike with a wagon load of peaches, selling them, and he bought some of the peaches from appellant; that in this transaction he recognized him and asked him when the case was going to come up; that on this occasion appellant went into the bank where he was and was talking about the case and especially about Mr. Clower's testimony on the examining trial; that appellant then told him that he (Clower) must be mistaken and had him mixed up with somebody else about saying that he sold a span of mules in Oklahoma; that he never owned any mules and never sold any in Oklahoma; that appellant then asked him if there wasn't four $100 bills in the $600 that he had deposited with his bank on February 13th. And he also told witness that he must have been mistaken in his testimony on the examining trial when he said that he (appellant) told him at the time he deposited the money that he was from Oklahoma. Mr. Clower further testified that there were no $100 bills in the money appellant had deposited with him; that there were no bills of a higher denomination than $20; that when appellant, on this occasion, was talking to him about the denomination of the bills that he had deposited he asked him if he didn't remember about the four $100 bills; that he told him no; that appellant insisted and that he then examined his books and daily reports where they had itemized the denomination of their bills and they had no $100 bills on that day.

It is noticeable that while Mr. Ables (appellant's father) testified that he (Mr. Ables) did not see Mr. Cutts' money, he fails wholly to testify that appellant did not find and take it. They were together constantly while at the deceased lady's house, on their second visit late in the evening, remained there together alone after Mr. Cutts left them, starting to his home and left the dead lady's place when no one was in the yard, except them, and stayed constantly together from then until Mr. Cutts hailed them with the result stated above.

The testimony of Mr. Cutts and Mr. Ables, taken together, unquestionably puts appellant where he alone could have found and taken Cutts' money, and excludes the idea that any other did or had the

opportunity to get it. While the testimony of Mr. Cutts and the banker and Mr. Lilly could not and did not, with absolute certainty, identify the money which appellant deposited in the Klondike bank as that of Mr. Cutts, taking the description of it and the circumstances all together, they most certainly establish such a state of fact as that the jury were authorized to believe, as they evidently did believe, that the money that appellant deposited in the Klondike bank was that of Mr. Cutts which he had lost on the occasion stated. No other reasonable inference could be drawn from all the facts and circumstances.

As stated above, Mrs. Alsup, appellant's sister, testified in his favor. If the jury had believed her testimony, it would have tended to show that in December, 1913, and for some time prior thereto, appellant had had her to keep for him in her trunk a considerable sum of money. She did not know the exact amount, nor purport to know the exact amount; that she did not count it. She said that appellant and her husband counted the money which she kept for appellant, and that her husband knew how much there was; that she only knew from hearsay. Thereupon, on cross-examination of her, the State asked her where her husband was. She answered in Oklahoma. The State then asked her where and what he was doing in Oklahoma, to which question appellant objected on the ground that it was immaterial, irrelevant and prejudicial to his rights. The court overruled these objections and she answered that her husband was in jail in Oklahoma. It will thus be seen that appellant's brother-in-law, Mr. Alsup, was a most material witness for him. He was not present and did not testify. The State had a right to probe this matter to ascertain where this witness was and why he was not present and did not testify. The fact that he was thus related to appellant and was such a material witness that if Mrs. Alsup's testimony was true appellant would have had him there to testify and if not, the State had the right to know where he was so that it could get him there and have him testify in dispute of Mrs. Alsup's testimony. Jones v. State, 7 Texas Crim. App., 103; Thompson v. State, 11 Texas Crim. App., 51; Logan v. State, 53 S. W. Rep., 694; Jackson v. State, 56 Texas Crim. Rep., 28; Sweeney v. State, 146 S. W. Rep., 883, and authorities cited. The court did not err in overruling appellant's objections to this testimony of Mrs. Alsup.

The court gave a most complete and apt charge, safeguarding appellant's rights in every way. The two questions above decided, as we understood from appellant's able attorney in submitting this case, were the only two material ones. No others require any discussion.

The judgment is affirmed.

*Affirmed.*

DAVIDSON, Judge (dissenting).—I am inclined to believe the evidence is too weak and inconclusive to form the basis of this conviction. No witness ever placed appellant in possession of the money in question. The owner himself did not know when or where he lost it, and the only theory upon which appellant could possibly be convicted was that the

owner of the money lost it and appellant subsequently found it. The owner did not know where he lost it. He recollected having it in his pocket, and after leaving the place where he last remembered having the money, he missed it. Appellant had money, and for this he gave a reasonable account, and it was not identified as the money belonging to the alleged owner. The circumstances are too weak, too inclusive to form the basis of conviction, in my judgment, and it does not exclude every reasonable hypothesis except the guilt of the accused The witness Mrs. Alsup testified for the appellant. The opinion states: "If the jury had believed her testimony it would have tended to show that in December, 1913, and for some time prior thereto, appellant had had her to keep for him in her trunk a considerable sum of money. She did not know the exact amount, nor purport to know the exact amount; that she did not count it. She said that appellant and her husband counted the money which she kept for appellant, and that her husband knew how much there was; that she only knew from hearsay." It might be stated, in a general way, that appellant accounted for the money he deposited in the bank; among other things, he sold a pair of mules for a considerable amount of money, but I do not purpose here to rehash this testimony. On cross-examination Mrs. Alsup was asked where her husband was. She replied that he was in Oklahoma. The State asked her where, and what he was doing in Oklahoma. To this appellant urged various objections. The court overruled the objections and she answered that her husband was in jail in Oklahoma. The opinion of the majority in this connection says: "It will thus be seen that appellant's brother-in-law, Mr. Alsup, was a most material witness for him. He was not present and did not testify. The State had a right to probe this matter to ascertain where this witness was and why he was not present and did not testify. The fact that he was thus related to appellant and was such a material witness that if Mrs. Alsup's testimony was true appellant would have had him there to testify and if not, the State had the right to know where he was so that it could get him there and have him testify in dispute of Mrs. Alsup's testimony." The absence of a material witness for the defendant is never chargeable to him unless the absence of the witness is in some way attributable to acts or conduct of the accused. In this case the testimony shows beyond any question that appellant was not the cause of the absence of the witness; that he was taken under process of law and placed in jail, supposedly for some violation of the law. We understand that men are not usually placed in jail in our country except for violations of the law. Appellant was not responsible for this, nor should he be charged up with it. It introduced an extraneous matter foreign to the case, and proved before the jury that the absent witness was charged with a violation of the law in another State, and thus attacked his character and his reputation in advance of his being used as a witness, and in his absence as a witness was used to prejudice the case with the jury, he being the brother-in-law of the defendant. This was certainly calculated to impress the jury prejudicially to appellant's

rights. How this character of testimony could possibly have been admitted in this case passes my comprehension; nor do the cases cited by the majority opinion sustain such proposition. Some of them do not even bear upon the question. The statement in the majority opinion, towit: "the State had the right to know where he was so that it could get him there and have him testify in dispute of Mrs. Alsup's testimony," is to say the least rather anomalous. It would hardly be considered a correct statement of law, that the State on the trial of a case could prove where the absent witness was that it might have him to testify in the case when the facts showed he was in another State and could not possibly be had. If the State wanted to know where he was to use him as a witness, the trial of the matter before the jury was not the place to seek that information. If that is a valid ground, then the State would be permitted at all times and under all circumstances to introduce such damaging facts before the jury upon the plea that they were trying to locate the witness to use on that trial, when it was known or could have been known he was in a distant State incarcerated in jail charged with crime. Such "stage play" operated to prejudice the rights of the defendant before the jury. If this is the correct rule for the State, it would be equally correct for the defendant. They say it is a poor rule that won't work both ways. Hereafter if an absent State witness should be located in jail under a charge of felony, the defendant would be authorized to prove that fact before the jury as a means of locating the witness so that he might have him before the jury, when it was known at the time, or could have been so known, that he was beyond the jurisdiction of the court, or was at such distance from it he could not possibly be obtained. Under such circumstances if the trial is to be stopped and the absent witness hunted up, a continuance should be granted in order that he might get the witness, or the testimony, and if in another State, the defendant would have the right to a continuance in order to get his deposition. The statement of the proposition by the majority is a sufficient answer within itself without discussing it. I can not agree to this affirmance

### ADDITIONAL OPINION.

#### July 7, 1915

PRENDERGAST, PRESIDING JUDGE.—We add this to our original opinion. No motion for rehearing was made herein. No dissenting opinion was filed at the time the original opinion was handed down. The court stenographer has shown us a dissenting opinion which is now to be filed—some time after the court has adjourned for the term.

1. In the original opinion we gave the substance of the material incriminating evidence. Therefrom appellant and his father were shown to have been the only persons who could have found and stolen Mr. Cutts' money. His father swore positively he did not find and steal it. Hence the conclusion is inevitable that appellant, and no other, did. Besides, soon after the theft appellant alone is shown to

have been in possession of money which suited the description of Mr. Cutts' money, at such place and under such circumstances as unquestionably showed the money he then had and part of which he then deposited in the Klondike bank, was the money stolen from Cutts, and not any other money. Appellant swore not at all, but when he was depositing $600 of that money, and kept part of it and replaced that part in his pocket, he then told Mr. Clower and Mr. Lilly upon their inquiry—so swore Mr. Clower: "Myself or Mr. Lilly asked him (defendant) where he got the money, and he said he sold out in Oklahoma, that he sold a pair of mules for $400 of the money." (Statement of facts, pp. 9-10.) After hearing said witness so testify on his examining trial, the next time appellant saw him, Mr. Clower swore: "On the defendant's last visit there we were talking about Oklahoma, about the mule proposition, and he said to me this way; he says: 'You must be mistaken and have me mixed up with somebody else about saying I sold a span of mules in Oklahoma. *I have never owned any mules.'*" (Statement of facts, p. 14.) Again, a fair and impartial jury, after hearing all the witnesses and seeing their manner of testifying, etc., upon their solemn oaths found that from all the evidence "it was of such a conclusive nature, leading on the whole, to a satisfactory conclusion, and producing, in effect, a reasonable and moral certainty that appellant, and no other person, committed the offense charged, and excluded, to a moral certainty, every other reasonable hypothesis except his guilt." A learned and long experienced trial judge also upon his official oath so found. We have no particle of doubt that the evidence is amply sufficient, both as a matter of law and of fact, to sustain the jury and trial judge.

2. Appellant did not urge "various objections" to the testimony of his sister, Mrs. Alsup, when she swore: "that her husband, A. L. Alsup, was, at the time of the trial, in Oklahoma in jail." His sole objection was, as stated in his bill of exception No. 1, which alone presents the question (Record, p. 11, where his bill is copied) : . . "to which question counsel for defendant then and there objected upon the ground that the same was immaterial, irrelevant and prejudicial to the rights of the defendant."

The Supreme Court of the United States in Graves v. U. S., 150 U. S., 118, 14 Sup. Ct., 40, 37 L. Ed., 1021, says: "The rule even in criminal cases is that if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable. 1 Starlie, Ev., 54; People v. Hovey, 92 N. Y., 554, 559; Mercer v. State, 17 Texas Crim. App., 452, 467; Gordon v. People, 33 N. Y., 508."

2 Standard Ency. of Law & Proc., 773, a most valuable recent work so far as completed, says: "On the trial of a criminal case, the failure to produce available witnesses, the absence of any evidence wilfully omitted by the State or the accused, or that the evidence suggests, has been wilfully omitted, forms a predicate for any legitimate deduction

for or against the defendant, where the materiality and competency
of such evidence appears. . . ." Citing many authorities sustaining
this rule. Among them are cases from the United States Supreme
Court, and the States of Alabama, Georgia, Iowa, Kansas, Kentucky,
Massachusetts, Michigan, Minnesota, Missouri, North Carolina, Oregon,
Texas, and Wisconsin.

Evidently Jones' defense in Jones v. State, 7 Texas Crim. App., 103,
was that he had bought the horse which he was charged with stealing.
He introduced a witness who swore that he and one Scott and one
Swain were present and also witnessed the horse trade. The court
(p. 105) said: "The State's counsel asked the witness on cross-exami-
nation, 'where were said Scott and Swain when you last heard of them?'
The question was objected to, and the objection overruled, and the wit-
ness was permitted to answer the question. We are of opinion that the
court did not transcend the latitude allowed in the cross-examination
of a witness. Greenl. on Ev., sec. 445 et seq." Jones was convicted
and his punishment assessed at ten years in the penitentiary. The case
was affirmed.

Thompson was convicted for the rape of Mrs. Janssen and assessed
the death penalty. He appealed. His case is reported in 11 Texas
Crim. App., 51, and affirmed. One of his bills of exceptions was as
follows: "The injured party, Mrs. Janssen, was allowed, over objection
of defendant, to tell the jury that the old man, her father-in-law, was
knocked down by defendant,—remained on the ground bleeding and
helpless,—and that after the rape had been committed called to her
for assistance, and that she got him into the house,—that he is now
dead. Defendant, by counsel appointed by the court, objected to this
for the reason that the prisoner was on trial for the rape of Mrs.
Janssen, and not for the murder or assault of the old man, her said
father-in-law, and that the statement was irrelevant and improper, and
calculated to greatly influence the minds of the jury against defendant
to his great injury," etc.

After holding all the first part of her testimony quoted admissible,
as to the last sentence, this court, through Presiding Judge White, said:
"So far as the additional statement by the witness of the fact that her
father-in-law was dead is concerned, it was admissible as it fully ac-
counted for the non-production of this old man, who, from the other
evidence adduced, would have been beyond doubt a most important
witness to corroborate in a great measure the evidence of the prose-
cutrix. We see no error in the admission of this testimony."

In Logan v. State, 53 S. W. Rep., 694, Logan was convicted of mur-
der and his punishment assessed at twenty years in the penitentiary.
The case was affirmed. In that case this court, through Judge David-
son said: "Appellant offered in evidence four subpoenas issued at the
instance of the State for the witnesses Ragsdale, Jones and Shanks.
It is stated in the bill of exceptions that these were eyewitnesses to the
transaction, and the State had refused to put them on the stand at
the request of appellant. The object of introducing this process was

to show 'that said witnesses had attended court, been sworn, and placed under the rule as witnesses for the State, and were not there at the instance of the defendant,' etc. We believe the appellant had the right to introduce the subpoenas, or prove by any legitimate testimony that these three witnesses had been subpoenaed by the State, and that the State had refused to place them on the witness stand."

In Jackson v. State, 56 Texas Crim. Rep., 28, Jackson was convicted of murder and his punishment assessed at life imprisonment. This court affirmed his case. He objected to the district attorney's argument wherein he discussed the fact that appellant did not put his father on the stand and have him testify. This court, through Judge Ramsey, said: "The argument of the district attorney was well within his rights. The failure of a defendant to place upon the witness stand one so closely related to him as his father, who is shown to be present, and who must, in the nature of things, have been advised of the circumstances of the crime charged, is a proper subject of comment and discussion. In ordinary experience the inference is fair that the testimony of the person so related would have been unfavorable. Even under our strict construction in respect to the testimony of the wife, it has been held that the failure of the defendant to use her as a witness, where the circumstances show she would have known the facts in the case, is a proper subject of comment." See also Mercer v. State, cited by the Supreme Court of the United States, supra.

"The rule, without question, is, that *either side* can introduce any pertinent testimony tending to prove any pertinent issue in the case, *or which may do away with, or lessen the adverse effect of any proper deduction that may be made from evidence that is introduced against him.*" Sweeney v. State, 65 Texas Crim. Rep., 593, 146 S. W. Rep., 883. These five cases were cited by us in the original opinion.

Judge White, in sec. 1070 of his Ann. C. C. P., p. 676, says: "Relevancy is defined to be that which conduces to the proof of a pertinent hypothesis—a pertinent hypothesis being one which, if sustained, would logically influence the issue. Hence it is relevant to put in evidence any circumstance which tends to make the proposition at issue either more or less probable."

As expressed by 11 Ency. of Ev., p. 193-4: "And conversely, evidence, the probative effect of which is to show that the adverse party's contention is probably unsound because not maintained in good faith, is held to be relevant. Thus evidence of the failure of the adverse party to call a witness who has knowledge of important facts . . . is relevant." Every other text-book writer is to the same effect, as well as every judge who has had occasion to pass on the question. To collate these authorities would be interminable.

There can be no doubt but that each and all of these cases are precisely in point, and sustain our holding, as well as all text-books do, and establish beyond controversy that said testimony was admissible, notwithstanding the dissenting opinion says: "How this character of testimony could possibly have been admitted in this case passes my com-

prehension: nor do the cases cited by the majority opinion sustain such proposition."